IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE )<br>APPLICATION OF THE UNITED )<br>STATES OF AMERICA FOR AN )<br>ORDER DIRECTING A PROVIDER )<br>OF ELECTRONIC COMMUNICATION )<br>SERVICE TO DISCLOSE RECORDS )<br>TO THE GOVERNMENT ) | Magistrate's No.: 07-524 |

## GOVERNMENT'S MEMORANDUM OF LAW
## IN SUPPORT OF REQUEST FOR REVIEW

AND NOW comes the United States of America by its attorneys, Mary Beth Buchanan,

United States Attorney for the Western District of Pennsylvania, and Soo C. Song, Assistant United

States Attorney for said district, and hereby seeks review of the Opinion and Memorandum Order

entered on February 19, 2008, by United States Magistrate Judge Lisa Pupo Lenihan at Magistrate's

No. 07-524M, denying an application by the United States seeking disclosure of historical cell-site

information pursuant to Sections 2703(c) & (d) of the Stored Communications Act ("SCA"), 18

U.S.C. § 2703(c) & (d) (the "Opinion and Order") .[1]  Copies of the Application and the Opinion and

Order are attached as Exhibits A (filed separately under seal) and B, respectively.  For the reasons

set forth below, the government respectfully submits that this Court should reverse the Magistrate

Judge's order and grant the Application in the instant case.

### I.  FACTUAL AND PROCEDURAL HISTORY

### A.  Historical Cell-Site Information

Cellular telephone companies keep, in the regular course of their business, records of certain

---

[1]  The Opinion and Order has since been published as *In re Application of the United States*, 534 F. Supp. 2d 585 (W.D. Pa. 2008).  Although authored by Magistrate Judge Lenihan, the Opinion and Order was signed by all but one of the Magistrate Judges in this district.

information associated with their customers' calls.  Exhibit C contains an exemplar of these records

from a major carrier, Sprint-Nextel, the same carrier whose records are at issue in the present case.[2]

As reflected in Exhibit C, the records include for each call a customer made or received:  (1) the date

and time of the call; (2) the telephone numbers involved; (3) the cell tower to which the customer

connected at the beginning of the call; (4) the cell tower to which the customer was connected at the

end of the call; and (5) the duration of the call.   The records may also, but do not always, specify

a particular sector of a cell tower used to transmit a call.[3]  No such record is created when the phone

is not in use.

Cell tower information is useful to law enforcement because of the limited information it

provides about the location of a cell phone when a call is made.  As one court has explained:

> The information does not provide a "virtual map" of the user's location.  The
> information does not pinpoint a user's location within a building.  Instead, it only
> identifies a nearby cell tower and, for some carriers, a 120-degree face of that tower.
> These towers can be up to 10 or more miles apart in rural areas and may be up to a
> half-mile or more apart even in urban areas.

*In re Application of United States for an Order for Disclosure of Telecommunications Records*, 405

F. Supp. 2d 435, 449 (S.D.N.Y. 2005) (citation omitted).  No Global Positioning System ("GPS"),

that is, satellite-derived data, or other precision location information is contained in the historical

records provided pursuant to the requested orders. Indeed, cell-site records do not even indicate a

phone's distance from the serving tower, let alone its specific location.

---

[2]  Because these records contain sensitive information pertaining to a recent investigation,
certain identifying information – the telephone numbers involved – has been redacted.

[3]  Cell towers are often divided into three 120° sectors, with separate antennas for each of
the three sectors. To the extent this information does exist in a particular instance, it does not
provide precise information regarding the location of the cell phone at the time of the call, but
instead shows only in which of the three 120°, pie-slice sectors the phone was probably located.

2

**B.  The United States' Application Pursuant to 18 U.S.C. § 2703(d) in this Investigation**

Pursuant to 18 U.S.C. § 2703(c)(1), the United States may require a provider of electronic communication service to disclose "a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)" when it obtains a court order for such disclosure pursuant to 18 U.S.C. § 2703(d) (hereinafter, a "2703(d) order").  A 2703(d) order is issued by a court when the government provides "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation."  18 U.S.C. § 2703(d).

On February 22, 2008, the United States filed an application with Magistrate Judge Lenihan seeking a 2703(d) order directing Sprint Spectrum to disclose certain historical connection and cell-site information associated with a specified cell phone.  *See* Exhibit A.  The cell phone records are relevant and material to an ongoing investigation into large-scale narcotics trafficking and various related violent crimes.

In June 2007, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") learned from a confidential source that a particular subject and his associates use their wireless telephones to arrange meetings and transactions in furtherance of their drug trafficking activities.  Additional investigation, along with information from the source, indicates that the subject's narcotics supplier lives in another state.  Because the subject and his confederates use a variety of vehicles and properties to conduct their illegal activities, physical surveillance has proven difficult.  In order to develop better information on the location and identity of the drug supplier, the instant Application seeks historical cell-site records concerning a phone known to be used by the subject.  Section

2703(d) orders are broadly used and widely accepted for these types of purposes in federal criminal investigations across the country.

On February 19, the Magistrate Judge denied the Application, ruling in a written opinion that the United States is barred as a matter of law from obtaining historical cell-site information pursuant to a 2703(d) order.

## II.  ISSUE PRESENTED

The issue before the Court is purely a question of law, namely whether the government may obtain historical cell-site usage records pursuant to an order under 18 U.S.C. § 2703(d).

## III.  SUMMARY OF ARGUMENT

Section 2703(d) permits the government to obtain a court order compelling historical cell-site usage information from a wireless carrier.  The plain language of the statute unambiguously states that the government may require "a provider of electronic communication service" to disclose "a record or other information pertaining to a subscriber" pursuant to a 2703(d) order.  As explained below, historical cell-site information satisfies each element of the statute, a position endorsed in recent months by several other courts.

In reaching the opposite conclusion, the Opinion and Order contains numerous errors, both as to the facts of the underlying technology and as to the interpretation of applicable law.  Indeed, as discussed below, we believe the Opinion and Order materially relies on at least one statute (and several cases) wholly inapplicable to the government's request for stored records of past customer activity.  In addition, because wireless carriers regularly generate and retain the records at issue, and because these records provide only a very general indication of a user's whereabouts at certain times

in the past, the requested cell-site records do not implicate a Fourth Amendment privacy interest. Because the Opinion and Order misstates both the relevant facts and the applicable law, we respectfully urge the Court to reverse.

## IV.  ARGUMENT

**A.      Historical Cell-Site Information Falls Within the Scope of Sections 2703(c) and (d)**

As the Third Circuit has often reiterated, "'[t]he plain language of the statute is the starting place in our inquiry.'" *United States v. Introcaso*, 506 F.3d 260, 264 (3d Cir. 2007) (*quoting Staples v. United States*, 511 U.S. 600, 605 (1994)).  "'If the language of a statute is clear[,] the text of the statute is the end of the matter.'" *Id.* (*quoting United States v. Jones*, 471 F.3d 478, 480 (3d Cir. 2006)).

The Stored Communications Act (SCA), 18 U.S.C. §§ 2701 *et seq.*, establishes a comprehensive framework regulating government access to customer records in the possession of communication service providers.  The statute's structure reflects a carefully crafted series of Congressional judgments; it distinguishes not only between communications contents (§ 2703(a), (b)) and non-content records (§ 2703(c)), but also between different classes of non-content records.

18 U.S.C. § 2703 unambiguously states that the government may require "a provider of electronic communication service" to disclose "a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)" pursuant to a 2703(d) order.[4]  *See* 18 U.S.C. § 2703(c)(1).  As explained below, cell-site information quite

---

[4]  As noted above, a 2703(d) order is issued by a court when the government provides "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are

clearly satisfies each of the three elements necessary to fall within the scope of this provision.

First, a cell phone company is a provider of electronic communication service. "Electronic communication service" is defined to mean "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. §§ 2510(15) & 2711(1). Cell phone service providers provide their customers with the ability to send wire communications, and thus they are providers of electronic communication service. *See* 18 U.S.C. § 2510(1) (defining wire communications).

Second, cell-site information constitutes "a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)." Historical cell-site information is a record stored by the provider concerning the particular cell tower used by a subscriber to make a particular cell phone call, and it is therefore "a record or other information pertaining to a subscriber or customer." *See In re Application of United States for an Order for Disclosure of Telecommunications Records*, 405 F. Supp.2d 435, 444 (S.D.N.Y. 2005) (noting that cell-site data is "information" and "'pertain[s]' to a subscriber...or customer of cellular telephone service").

Third, cell-site information is non-content information, as it does not provide the content of any phone conversation the user has over the cell phone. *See* 18 U.S.C. § 2510(8) (defining the "contents" of a communication to include information concerning its "substance, purport, or meaning"). Thus, because historical cell-site information satisfies each of the three elements of § 2703(c)(1), its disclosure may be compelled pursuant to 2703(d) order.

While the statute is unambiguous and thus resort to the legislative history is unnecessary, the

_____

relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

legislative history of § 2703(c)(1) nevertheless confirms that it encompasses cell-site information. When the SCA was first enacted as part of the Electronic Communications Privacy Act ("ECPA") in 1986, it permitted disclosure pursuant to a 2703(d) order (or subpoena) of the same catch-all category of "record[s] or other information pertaining to a subscriber or customer of such service (not including the contents of communications)" now codified at 18 U.S.C. § 2703(c)(1). *See* ECPA § 201, P.L. 99-508, 100 Stat. 1848, 1862 (1986). The accompanying 1986 Senate report emphasized the breadth of the "record or other information" category of information: "the information involved is information about the customer's use of the service[,] not the content of the customer's communications." S. Rep. No. 541, 99th Cong., 2d Sess. 38 (1986), *reprinted in* 1986 U.S. Code Cong. & Admin. News 3555, 3592 (1986). Moreover, cellular telephones were one of the new technologies of particular importance to Congress when it enacted ECPA, so there is no basis to exclude cellular telephone usage records from the scope of § 2703. *See* H.R. Rep. No. 647, 99th Cong., 2d Sess. 20-21 (1986).

Numerous recent decisions confirm the government's view that 2703(d) orders may be used to obtain historical cell-site records. For instance, in September 2007, United States District Court Judge Stearns in Boston reversed a magistrate judge's denial of a 2703(d) application for such records. *See In re Applications*, 509 F. Supp. 2d 76 (D. Mass. 2007) ("*Stearns D. Mass. Opinion*"). After conducting a careful analysis of the SCA's text, Judge Stearns held that "historical cell site information clearly satisfies" the statute's definitional requirements, rejecting the magistrate's analysis and granting the application. *Id.* at 80.

The following month, Judge Rosenthal in Houston confronted a similar situation: a magistrate judge had denied the government's application for, *inter alia*, historical cell-site data

under the authority of § 2703(d). *See In re Application*, 2007 WL 3036849 (S.D. Tex. Oct. 17, 2007). Here, too, the district court found the magistrate's objections on this question wholly without merit, reversing and holding that "the Government's request for historical cell-site information is within the statutory authorization." *Id.* at *5.

And most recently, on March 26, 2008, a federal magistrate judge in Atlanta issued an opinion rejecting a defendant's motion to suppress historical cell-site records acquired by means of a 2703(d) order. *See United States v. Suarez-Blanca*, No. 1:07-CR-0023-MHS/AJB (N.D. Ga. Mar. 26, 2008) (copy attached as Exhibit D). In his opinion endorsing the government's approach, the magistrate noted – and disagreed with – the Magistrate Judge's Opinion and Order in the present case. *Id.* at 32-33.

**B.      No Other Authority Limits the Compelled Disclosure of Historical Cell-Site Information Pursuant to a 2703(d) Order**

The Opinion and Order errs at the outset by proposing to answer a legal question that is simply not relevant to this case. Instead of addressing the question at hand – whether the government may obtain <u>historical</u> cell-site records via a 2703(d) order – the decision below places a great deal of emphasis on determining the proper authority for obtaining such information <u>prospectively</u>. Prospective cell-site information is not at issue in this case. The decision never fully recovers from this initial wrong turn, and as a result conflates the legal principles actually relevant to the government's Application.

In the course of the analysis, the Magistrate Judge cites several authorities as purported limits on the government's ability to compel disclosure of historical cell-site information pursuant to 2703(d) orders. In particular, the Opinion and Order concludes that 47 U.S.C. § 1002(a)(2); the

mobile tracking device provision of 18 U.S.C. § 3117; the text of § 2703 itself; the Fourth Amendment; and the Wireless Communication and Public Safety Act of 1999 ("WCPSA") all bar the government from compelling disclosure of cell-site information via 2703(d) orders.

However, as explained below, the cited Title 47 provision applies only to <u>prospective</u> evidence-gathering, and not to the instant Application for an order compelling historical records. Section 3117 is likewise inapplicable because a user's own phone is not a "tracking device" within the narrow meaning of that statute.  On the other hand, § 2703 not only applies, but on its face permits the government's current Application.  Finally, the customer records at issue are not protected by the Fourth Amendment.  As a result, none of these authorities prohibits or even limits compelled production of historical cell-site information pursuant to a 2703(d) order, and the Opinion and Order below should therefore be reversed.

   1.   <u>47 U.S.C. § 1002 Does Not Apply to Requests for Historical Records, and Therefore Does Not Prohibit Compelled Production of Historical Cell-Site Information Pursuant to a 2703(d) Order</u>

The Opinion and Order below devotes enormous space to discussion of the 1994 Communications Assistance for Law Enforcement Act (CALEA).  In particular, the decision below places great weight on the fact that CALEA, at 47 U.S.C. § 1002(a)(2), states that

> information acquired <u>solely pursuant to the authority for pen registers and trap and trace devices</u> (as defined in section 3127 of title 18, United States Code) ... shall not include any information that may disclose the physical location of the subscriber.

(Emphasis supplied.)   However, the present Application neither invokes nor in any way relies on the pen register/trap and trace statute.  On the contrary, the government's request – for historical, not future, cell-site records – relies on the entirely separate authority of 18 U.S.C. § 2703(d).

Because the CALEA provision quoted above mentions only the pen/trap statute, and not

9

§ 2703(d), it would be wholly improper to read into it what Congress chose to omit.  Under the

longstanding canon of *expressio unius est exclusio alterius* ("the expression of one is the exclusion

of the other"), a court should presume that if "Congress wanted to include such a requirement ... it

knew exactly how to do so."  *United States v. Thornton*, 306 F.3d 1355, 1359 (3d Cir. 2002). In the

case of CALEA, this omission can hardly be called accidental.  Congress was well aware of

§ 2703(d) in its deliberations over CALEA; in fact, a separate portion of the Act amended § 2703(d)

to raise the showing required of the government.  *See* Pub. L. 103-414, § 207(a) (1994).[5]

The decision below simply disregards the fact that 47 U.S.C. § 1002 imposes limits only on

the pen/trap statute, and not on § 2703(d).  Instead, it leans heavily in its analysis on numerous cases

applying the CALEA restriction to government requests for prospective collection of future cell-site

records.[6]

---

[5] Nor does *expressio unius* produce an absurd result in this instance.  A pen register order may issue where the government has made a mere certification of relevance.  *See* 18 U.S.C. § 3123(a)(1).  In contrast, § 2703(d) imposes the higher "specific and articulable facts" criterion. *See* H. Rep. No. 827, 103d Cong., 2d Sess. 31 (1994) (noting that change in required 2703(d) showing from relevance to specific and articulable facts "rais[es] the standard"), *reprinted in* 1994 U.S. Code Cong. & Admin. News 3489, 3511.

[6] Magistrates and district courts have disagreed over whether § 2703 and the pen register statute can be used together to compel disclosure of cell-site information prospectively, an issue not raised in this case.  *Compare In re Application of United States for an Order for Prospective Cell Site Location Information*, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (upholding "hybrid" use of 2703(d) orders and pen/trap statute to compel prospective disclosure of cell-site information) *with In re Application of United States for an Order Authorizing Use of a Pen Register and Trap and Trace Device*, 396 F. Supp. 2d 294 (E.D.N.Y. 2005) (rejecting such hybrid orders).
However, as the Magistrate Judge's Opinion and Order concedes, *see* 534 F. Supp. 2d at 600, even judges who have rejected prospective hybrid orders for cell-site information have agreed that compelled disclosure of historical cell-site information pursuant to 2703(d) orders is proper.  *See, e.g.*, 396 F. Supp. 2d at 327 ("The applicable statutes allow the government to obtain historical cell site information on the basis of a showing less exacting than probable cause, but do not allow it to obtain such information prospectively on a real-time basis.").

10

The Magistrate's opinion acknowledges the prior decisions holding (or implying) that historical cell-site records may be obtained by way of § 2703(d).  In the same breath, however, the decision below dismisses that same precedent with the surprising claim that the legal distinction between prospective and historical cell-site records is "largely-unexplained." 534 F. Supp. 2d at 603.  In fact, the government submits that the distinction is indeed clear, depending as it does on the explicit wording and structure of the pertinent statutes.

In crafting the federal statutes regulating governmental access to telecommunications records, Congress has unambiguously distinguished between historical (stored) and future records.  Most prominently, Chapter 121 of Title 18 (the Stored Communications Act, §§ 2701 *et seq.*) stands in contrast to the Wiretap Act (Chapter 119) and the pen register statute (Chapter 206), both of which exclusively regulate prospective, ongoing surveillance (of content and non-content, respectively).  Thus, the mechanism for obtaining historical telephone calling records – a subpoena, as provided for at § 2703(c)(2)(C) – differs from the authority under the pen/trap statute for monitoring the telephone numbers of future calls to or from a target telephone.

The decision below improperly disregards this key aspect of the statutes.  Because it wrongly relies on the CALEA limitation (and cases applying it) to conclude that the statutes "do not distinguish between historic[al] and prospective [cell-site records]," 534 F. Supp. 2d at 586 n.4, its analysis should be rejected.

2.     The Statutory Provisions Concerning "Tracking Devices" Do Not Limit Compelled Disclosure of Historical Cell-Site Information

The Opinion and Order also asserts that the United States may not use a 2703(d) order here because historical cell-site information is a communication from a "tracking device" as defined in

18 U.S.C. § 3117.  *See* 534 F. Supp. 2d at 601-07.  The analysis, however, is simply not supportable.  As explained below, "tracking device" communications are excluded only from the definition of "electronic communication"; cellular telephone calls are instead "wire communications," a defined term with no comparable exclusion.  Second, a user's own wireless phone is not a "tracking device" within the narrow meaning of the statute.

The decision below relies heavily on 18 U.S.C. § 2510(12)(C), which excludes "any communication from a tracking device" from the definition of "electronic communication."  Under the reasoning of the Opinion and Order, this provision excludes cell-site records from the reach of ECPA.  In reaching this conclusion, however, the opinion overlooks one crucial, plainly expressed statutory distinction: cellular telephone calls are not "electronic communications" under <u>any</u> circumstances.  On the contrary, conventional cellular calls are instead "wire communications" as defined at section 2510(1).[7]   Of equal importance, the "wire" and "electronic" categories are mutually exclusive: a "wire communication" cannot, under the express terms of the statute, also be an "electronic communication."  *See* § 2510(12)(A) ("'electronic communication' ... does not include–(A) any wire or oral communication").  Thus, properly analyzed under the statute, historical cell-site information concerning a wireless telephone call is plainly "a record or other information pertaining to a subscriber" using a service provider's network to send and receive "wire communications."  *See Stearns D. Mass. Opinion*, 509 F. Supp. 2d at 80 (reversing magistrate

---

[7]   The essential distinction is that a "wire communication" necessarily involves the human voice.  *See* § 2510(1) (defining "wire communication") and § 2510 (defining "aural transfer"); S. Rep. No. 541, 99th Cong., 2d Sess. 11 (1986), *reprinted in* 1986 U.S. Code Cong. & Admin. News 3555, 3565 ("cellular communications – whether they are between two cellular telephones or between a cellular telephone and a 'land line' telephone – are included in the definition of 'wire communications' and are covered by the statute").

judge's contrary conclusion).

The decision below overlooks these clearly articulated distinctions. Instead, the opinion dwells at length on the definition of an inapposite term ("electronic communication").  Having done so, the Opinion and Order further distorts the statute by construing the clear phrase "record or other information pertaining to a subscriber" to exclude

> information that is regarding or derived under a service (*e.g.*, a tracking capability/function) that may be used to facilitate the provision of an electronic communication service (*e.g.,* the transmission of voice/text material), but that is not *itself* an electronic communication service (as, *e.g.*, by definition).

534 F. Supp. at 604 (footnote omitted).   Because this unduly complicated interpretation – unsupported by even a single citation to the legislative history of the statute – does violence to the plain meaning of "pertaining to," this Court must reject it.  *See Malloy v. Eichler*, 860 F.2d 1179, 1183 (3d Cir. 1988) ("Where the language of the statute is clear, only 'the most extraordinary showing of contrary intentions' justify altering the plain meaning of a statute.") (*quoting Garcia v. United States*, 469 U.S. 70, 75 (1984)).

In addition, the decision below errs in finding that the target cell phone was a "tracking device" within the meaning of 18 U.S.C. § 3117. This overly expansive reading runs contrary to the language, structure, and legislative history of ECPA, and it would significantly undermine privacy protections for users of communication networks.

The structure of 18 U.S.C. § 3117 makes clear that a "tracking device" is a homing device installed by the government. Specifically, 18 U.S.C. § 3117(a) applies only when a court is authorized to issue an order "for the installation of a mobile tracking device." It then provides that "such order may authorize the use of that device within the jurisdiction of the court, and outside that

13

jurisdiction if the device is installed in that jurisdiction." *Id.* Thus, the purpose of the tracking device statute is to provide a court with extra-territorial jurisdiction over use of tracking devices installed within its jurisdiction. Given the limited purpose of the tracking device statute, there is no basis for interpreting "tracking device" broadly to encompass devices which the government would never have any reason to apply to a court to install or use. *See Stearns D. Mass. Opinion*, 509 F. Supp. 2d at 81 n.11 (§ 3117 "governs the 'installation' of tracking devices.  The 'tracking' of a cell phone does not require the installation of any sort of device."); *In re Application*, 405 F. Supp. 2d 435, 449 n.8 (S.D.N.Y. 2005) (same).

The legislative history of § 3117 is equally clear that "tracking devices" are homing devices, not cell phones or other communications technologies. Most obviously, the 1986 House Report on ECPA cites the two landmark Supreme Court decisions concerning "beeper" homing devices, *United States v. Knotts*, 460 U.S. 276 (1983) (beeper installed in can of chloroform and used to track movements of car) and *United States v. Karo*, 468 U.S. 705 (1984) (beeper installed in can of ether expected to be used in production of cocaine). No mention is made of cellular telephones.

Likewise, the Senate Report on ECPA includes a glossary of technological terms. The glossary, which defines electronic tracking devices separately from cell phones and pagers, defines "electronic tracking devices" as follows:

> These are one-way radio communication devices that emit a signal on a specific radio frequency. This signal can be received by special tracking equipment, and allows the user to trace the geographical location of the transponder. Such "homing" devices are used by law enforcement personnel to keep track of the physical whereabouts of the sending unit, which might be placed in an automobile, on a person, or in some other item.

S. Rep. No. 541, 99th Cong., 2d Sess. 10 (1986), *reprinted in* 1986 U.S. Code Cong. & Admin.

News 3555, 3564 (1986).

Even more revealing is the fact that the very same 1986 legislation[8] addresses cellular telephone technology extensively in numerous other provisions unrelated to "tracking devices." Congress enacted ECPA because the Wiretap Act "had not kept pace with the development of communications and computer technology." S. Rep. No. 541, 99th Cong., 2d Sess. 2 (1986), *reprinted in* 1986 U.S. Code Cong. & Admin. News 3555, 3556 (1986). Cellular phones were one of the new technologies of particular importance to Congress, *see id.* at 2 & 9, and cellular technology is central to much of ECPA's legislative history. *See id.* at 2, 4, 6- 9, 11-12, 21, & 29-30.

Congress made clear that cellular communications were to be protected as wire communications by the Wiretap Act and the SCA. In particular, Congress amended the definition of "wire communication" to ensure that it encompassed cellular communications by inserting the phrase "including the use of such connection in a switching station" into 18 U.S.C. § 2510(1). *See* ECPA § 101, Pub. L. No. 99-508, 100 Stat. 1848 (1986). As noted by the Senate Report on ECPA, "[t]his subparagraph makes clear that cellular communications--whether they are between two cellular telephones or between a cellular telephone and a 'land line' telephone--are included in the definition of 'wire communications' and are covered by the statute." S. Rep. No. 541, 99th Cong., 2d Sess. 11 (1986), *reprinted in* 1986 U.S. Code Cong. & Admin. News 3555, 3565 (1986).

Despite this extensive discussion of cell phones throughout ECPA's legislative history, there is not a scintilla of evidence in the legislative history that Congress intended cell phones to be classified as tracking devices. Instead, all discussion of tracking devices suggests that Congress

---

[8] The tracking device statute was enacted as part of ECPA. *See* Pub. L. No. 99-508, 100 Stat. 1848, § 108 (1986).

15

understood tracking devices to be homing devices installed by the government.

There is no reason to supply "tracking device" with a meaning much broader than that intended by Congress, especially because doing so would deny many communications the privacy protection Congress intended them to have. If cell phones were classified as "tracking devices," text messages or e-mail transmitted from them would not be "electronic communications" under 18 U.S.C. § 2510(12)(C). As a result, such communications would fall outside the scope of the Wiretap Act, and it would no longer be a federal crime for an eavesdropper to intercept them. *See* 18 U.S.C. § 2511(1)(a) (criminalizing interception of wire, oral, and electronic communications). This result is plainly contrary to Congress's purposes in passing ECPA, and the Opinion and Order's expansive interpretation of "tracking device" should therefore be rejected.

Moreover, if "tracking device" were given the broad interpretation adopted below, nearly all communications devices would be tracking devices. Certainly any device relying on the cellular communication system (including many pagers, text messaging devices such as Blackberries, and cellular Internet systems) would be a "tracking device." The same is also true of banking ATMs, retail credit-card terminals, or even landline telephones (since it is possible to determine information about a person's location from his use of each).  But the Magistrate Judge's reasoning extends much further. It is generally possible to determine the physical location of a user connected to the Internet, and the whereabouts of fugitives and other suspects are frequently discovered based on their use of Internet-connected computers. Treating all such devices as "tracking devices" grossly distorts § 3117's scope and purpose, and this Court should reject the Magistrate Judge's overly broad reading of the statute.  *See United States v. Schneider*, 14 F.3d 876, 880 (3d Cir. 1994) (a court has an obligation to construe statutes to avoid absurd results).

16

A recent opinion from the Eastern District of California underscores all of these points:

No use of cell phones and cell towers for tracking was expressly contemplated, and perhaps was not even possible in 1986. Certainly the legislative history gives no such indication.

In addition, it would prove far too much to find that Congress contemplated legislating about cell phones as tracking devices. For example, if an agent presently used a cell phone to communicate the whereabouts of a suspect by using the phone's video feature while he was surveilling the suspect, one could fit this situation into the words of the statute-one was using an electronic device which "permitted" the tracking of the suspect. Or, take the example of the ubiquitous monitoring cameras, such as the "red light," parking lot or freeway cameras. These cameras track the location of many persons, albeit in a confined location, and could also fit in with the words of the statute. It is best to take the cue from Congress in this respect of electronic tracking devices, and confine § 3117(b) to the transponder type devices placed upon the object or person to be tracked.

*In re Application for an Order Authorizing the Extension and Use of a Pen Register Device*, 2007

WL 397129 (E.D. Cal. Feb. 1, 2007).

Thus, even if it were the case that cellular telephone calls were "electronic communications" – as set forth above, they unquestionably are not – the "tracking device" exclusion from the definition of that term is irrelevant because a user's own phone falls outside the narrow scope of that defined term.[9] For this reason as well, the decision below should be reversed.

---

[9] The Opinion and Order asserts that the use of tracking devices pursuant to 18 U.S.C. § 3117 requires probable cause. 534 F. Supp. 2d at 595. Even if a subscriber's own cell phone were a "tracking device," it would not follow that a Rule 41 warrant founded on a showing of probable cause would be required to obtain historical cell-site records. First, as the Advisory Committee Notes to the 2006 amendments to Rule 41 explain, if "officers intend to install and use the [tracking] device without implicating any Fourth Amendment rights, there is no need to obtain the warrant." Fed. R. Crim. P. 41, Advisory Comm. Notes to 2006 Amendments, Subdivision (b).   The Committee Notes further explain that "[t]he tracking device statute, 18 U.S.C. § 3117, does not specify the standard an applicant must meet to install a tracking device." *Id.* at subdivision (d).

Indeed, the statute does not even prohibit the use of a tracking device in the absence of conformity with § 3117.  *See United States v. Gbemisola*, 225 F.3d 753, 758 (D.C. Cir. 2000) ("But by contrast to statutes governing other kinds of electronic surveillance devices, section 3117 does not prohibit the use of a tracking device in the absence of conformity with the

3.    Section 2703(d) Does Not Permit a Court to Demand a Showing of Probable Cause

The Opinion and Order also asserts that § 2703 permits a court to demand a showing of probable cause as a precondition to issuance of a 2703(d) order. This conclusion allegedly flows from the express language and structure of § 2703. Instead, the text of the statute points to the opposite reading.

As before, "every exercise of statutory interpretation begins with an examination of the plain language of the statute." *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001). Where statutory language is "plain and unambiguous," no further inquiry is necessary. *Id.* On its face, § 2703(d) demands a showing of "specific and articulable facts." Nowhere does that subsection state, or even imply, that probable cause is or may be demanded.

Section 2703(c) permits the government to use any of various methods to obtain stored, non-content customer records. As the House Judiciary Committee noted in its report accompanying ECPA in 1986,

> the government must use one of three sets of authorized procedures. The government can rely on administrative subpoenas or grand jury subpoenas to the extent that such processes are legally authorized. Alternatively, the government can use a search warrant. Finally, the government can seek a court order directing the disclosure of such records. If a court order is sought then the government must meet the procedural requirements of subsection (d).

H. Rep. No. 647, 99th Cong, 2d Sess. 69 (1986) (emphasis added). Current § 2703(c)(1) preserves this structure, explicitly making 2703(d) orders a means of compelling records separate from and alternative to a warrant based on probable cause. *Compare* § 2703(c)(1)(A) (authorizing use of search warrant under Rule 41) *with* § 2703(c)(1)(B) (authorizing use of 2703(d) court order).

section.") (emphasis in original); *In re Application*, 405 F. Supp. 2d at 449 n.8 (same).

To do as the Magistrate Judge did below, and insist that a § 2703(d) application set forth probable cause, is in effect to demand a warrant, and thus to render part of the statute superfluous. This contravenes the longstanding canon that a court should, whenever possible, give effect to every provision of a statute. *See, e.g., Tavarez v. Klingensmith*, 372 F.3d 188, 190 (3d Cir. 2004).

Even if the text of the statute were not clear on its face, an examination of the legislative history confirms Congress's intent that a 2703(d) court order be granted on less than probable cause. As originally enacted in 1986, § 2703(d) required only a showing that "there is reason to believe ... the records or other information sought, are relevant to a legitimate law enforcement inquiry." Pub. L. 99-508, § 201 (1986). Eight years later, Congress affirmatively chose to raise the test to the current "specific and articulable facts" standard. *See* Pub. L. 103-414, § 207(a) (1994). As the accompanying House Judiciary Committee report makes clear, this is "an intermediate standard ... higher than a subpoena, <u>but not a probable cause warrant.</u>" H. Rep. No. 827, 103d Cong., 2d Sess. 31 (1994) (emphasis added), *reprinted in* 1994 U.S. Code Cong. & Admin. News 3489, 3511.

4.    <u>The Fourth Amendment Does Not Bar Compelled Disclosure of Historical Cell-Site Information Pursuant to a 2703(d) Order</u>

Finally, the Opinion and Order suggests that a user has a reasonable expectation of privacy in historical cell-site information. 534 F. Supp. 2d at 610-11. This conclusion is incorrect for two distinct reasons. First, under the established principles of *United States v. Miller*, 425 U.S. 435 (1976), and *Smith v. Maryland*, 442 U.S. 735 (1979), there is no reasonable expectation of privacy in such information, and, accordingly, no Fourth Amendment-protected privacy interest. Second, historical cell-site information is far too imprecise by any measure to intrude upon a reasonable expectation of privacy. Thus, the Fourth Amendment does not limit disclosure of historical cell-site

information pursuant to 2703(d) orders.

The cell-site data that the government is seeking is not in the hands of the cell phone user at all, but rather is in the business records of a third party – the cell phone company.  The Supreme Court has held that a customer has no privacy interest in business records of this kind.  Addressing a Fourth Amendment challenge to a third party subpoena for bank records, the Court held in *United States v. Miller*, 425 U.S. 435 (1976), that the bank's records "are not respondent's 'private papers'" but are "the business records of the banks" in which a customer "can assert neither ownership nor possession." *Miller*, 425 U.S. at 440; *see also SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 743 (1984) ("when a person communicates information to a third party ... he cannot object if the third party conveys that information or records thereof to law enforcement authorities").  Thus, an individual has no Fourth Amendment-protected privacy interest in business records such as cell-site connection information, to the extent the records are kept, maintained and used by a cell phone company in the normal course of business.  If anything, the privacy interest in cell-site information is even less than the privacy interest in a dialed phone number or bank records.  The location of the cell phone tower handling a customer's call is generated internally by the phone company and is not typically known by the customer.  A customer's Fourth Amendment rights are not violated when the phone company reveals to the government its own records that were never in the possession of the customer.

The Court's reasoning in *Smith v. Maryland* leads to the same result.  In *Smith*, the Court held both that telephone users had no subjective expectation of privacy in dialed telephone numbers and also that any such expectation is not one that society is prepared to recognize as reasonable. *See Smith*, 442 U.S. at 742-44.  The Court's reasoning applies equally to cell-site information.  First, the

20

Court stated: "we doubt that people in general entertain any actual expectation of privacy in the numbers they dial.  All telephone users realize that they must 'convey' phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed."  *Id*. at 742.  Similarly, cell phone users understand that they must send a radio signal which is received by a cell phone company's antenna in order to route their call to its intended recipient.  (Indeed, cell phone users are intimately familiar with the relationship between call quality and radio signal strength, as typically indicated by a series of bars on their phones' displays.)

Second, under the reasoning of *Smith*, any subjective expectation of privacy in cell-site information is unreasonable.  In *Smith*, the Court explicitly held that "even if petitioner did harbor some subjective expectation that the phone numbers he dialed would remain private, this expectation is not one that society is prepared to recognize as reasonable."  *Id.* at 743 (internal quotation omitted).  It noted that "[t]his Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.* at 743-44.  In *Smith*, the user "voluntarily conveyed numerical information to the telephone company" and thereby "assumed the risk that the company would reveal to the police the numbers he dialed."  *Id.* at 744.  Here, a cell phone user transmits a signal to a cell tower for his call to be connected and thereby assumes the risk that the cell phone provider will reveal the cell-site information to law enforcement.  Thus, it makes no difference if some users have never thought about how their cell phones work; a cell phone user can have no expectation of privacy in cell-site information.

As a business record in the possession of a third party, cell-site information should not be judged under Fourth Amendment standards for transponders and similar tracking devices surreptitiously installed by the government.  However, even measured against the constitutional

standards articulated by the Supreme Court in this area, there is no reasonable expectation of privacy in cell-site information. The mere use of a tracking device, even when surreptitiously placed by the government, does not implicate Fourth Amendment privacy concerns. *See United States v. Knotts*, 460 U.S. 276, 282 (1983) (police monitoring of beeper signals along public roads did not invade any legitimate expectation of privacy). To be of constitutional concern, a surreptitiously installed tracking device must reveal facts about the interior of a constitutionally protected space. *See United States v. Karo*, 468 U.S. 705, 713 (1984) (distinguishing *Knotts* and holding that police monitoring of a beeper that disclosed information about the interior of a private residence, not open to visual surveillance, required a warrant).

The Opinion and Order's "Technological Development Overview" makes certain claims about wireless telephone location information: 1) that wireless phone companies "store cell tower registration histories" reflecting a phone's location at seven-second intervals; 2) that "the location of just the nearest tower itself can place the phone within approximately 200 feet"; and 3) that triangulation techniques or GPS capabilities make a user's location "precisely determinable" to within as little as 50 feet. 534 F. Supp. 2d at 589-90. The first two claims are demonstrably false, and the third claim (also incorrect) is irrelevant to the separate type of records sought in the instant Application.

On the first issue, the Opinion and Order is correct that a wireless phone, when first powered on, "registers" with a nearby tower, and that the phone thereafter periodically re-registers with the network over time. (Network awareness of a phone's approximate recent whereabouts makes delivery of incoming calls more efficient.) However, no "history" of these events is maintained: once a phone moves into the coverage area of a new tower and registers with it, the prior information

is no longer useful, and the network management software simply deletes the prior registration data. Put differently, the only "registration" data in a carrier's possession at any given moment is the current information.  <u>No tower registration history is kept.</u>

As Exhibit C makes clear, historical cell-site data retained by the carriers – that is, the category of information called for by the government's Application in this case – reflects only the identity of the serving tower (and sector, if applicable) when the phone is in active use.  The carrier recorded and preserved the cell-site information only at the start and end of actual telephone calls occurring over a few days.  Plainly, a typical record such as Exhibit C does not even reveal the location of a nearby cell tower – let alone the phone user's own location – at 7-second intervals.

In making the second claim, the Opinion and Order cites only to a single law student note, which says

> [a] very general sense of a phone's is [*sic*] can be gathered by tracking the location of the tower being used during a call. In urban areas, where there are many towers, this may give a picture location [*sic*] within a couple hundred feet. In rural areas, towers may be miles apart. A slightly more accurate location picture can be generated by tracking which 120 degree "face" of the tower is receiving a cell phone's signal.

Kevin McLaughlin, *The Fourth Amendment and Cell Phone Location Tracking: Where Are We?*, 29 Hastings Comm. & Ent. L.J. 421, 426-27 (Spring 2007).  The author's sole source for these claims is a recent decision, *In re Application of United States for an Order for Disclosure of Telecommunications Records*, 405 F. Supp. 2d 435 (S.D.N.Y. 2005), which in fact contradicts the key assertion about precision in urban settings:

> In suburban or rural areas, towers can be many miles apart. <u>The Court has examined a map of cellular towers of a provider in lower Manhattan, which is one of the areas more densely populated by towers. In this area, the towers may be anywhere from several hundred feet to as many as 2000 feet or more apart.</u>
> [...]

> The information does not pinpoint a user's location within a building. Instead, it only identifies a nearby cell tower and, for some carriers, a 120-degree face of that tower. <u>These towers can be up to 10 or more miles apart in rural areas and may be up to a half-mile or more apart even in urban areas.</u>

*Id.* at 437 & 449 (expressly rejecting claim that Fourth Amendment protects such general location information) (emphasis added).

The Opinion and Order's second claim also contradicts repeated findings of the Federal Communications Commission, which relies on the advice of skilled telecommunications engineers (both on FCC staff and those employed by carriers filing public comments).  In one proceeding, for instance, the FCC found that a certain location-finding technique accurate to within 500-1000 <u>meters</u> (roughly 1640-3280 ft.) "would be significantly more precise" than "the location of the cell site or sector receiving the call."  *In re Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems*, 15 FCC Rcd. 17442, 17462 (Sept. 8, 2000).[10]  The Commission went on to note that simple cell-site information "can in some instances be misleading, as wireless calls are not always handled by the nearest cell."  *Id.*

Given a stark choice between crediting a lone law student (in this case, one misstating the factual findings of a federal court) and the FCC, the government respectfully suggests to this Court that the FCC is more credible.  For the same reasons, the Opinion and Order's claim that historical cell-site records "place the phone within approximately 200 feet" should also be rejected.

---

[10]  *See also In re Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems*, 16 FCC Rcd. 18305, 18311 n.49 (Oct. 12, 2001) (similar technique to locate phone within a 1000-meter radius held to be "a notable improvement in accuracy and reliability over ... the location of the cell site or sector receiving the call."); *In re Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems*, 14 FCC Rcd. 17388, 17414 (Oct. 6, 1999) (accuracy of 285 meters – 311 feet – "would be <u>far more accurate</u> than ... cell site location information.") (emphasis added).

The Opinion and Order's third claim – that triangulation techniques or GPS capabilities currently make a user's location "precisely determinable" to within as little as 50 feet – is simply inapposite.[11]  Those entirely distinct techniques relate to real-time (or prospective) location-finding capabilities, "Enhanced 9-1-1 Phase II" in FCC parlance.  As noted explicitly in all of the FCC documents referenced above, these prospective location-finding capabilities have been imposed by the FCC for the very reason that cell-site data ("Phase I" information) is so imprecise.

Simply put, the government's present Application seeks only historical cell-site – that is, single-tower and sector – records.  It does not seek GPS or "triangulation" information, which is in any event almost never available for past time periods.[12] Rather, the government has requested only the type of records shown in Exhibit C.

As an example, the first line of Exhibit C shows a May 1, 2007 call in the Boston area, Location Area Code 4361, from Cell ID 49874.  A separate spreadsheet (supplied by the carrier) that contains only general information about tower attributes – that is, no information about specific customer activities or usage – reveals that Cell ID 49874 corresponds to face number 1 (of 3) on a

---

[11]  As an aside, the government notes that this is also an exaggeration.  Current FCC regulations for emergency (911) calls require that, by September 11, 2012 – more than four years hence – carriers be able to deliver location data at a level of 100 meters for 67 percent of calls and 300 meters for 95 percent of calls (for so-called "network-based" solutions), and 50 meters for 67 percent of calls and 150 meters for 95 percent of calls (for handset-based solutions).  *See* 47 C.F.R. § 20.18(h)(1)(i), (ii).  These requirements apply only to customer-initiated calls to a "public safety answering point" (911 operators).  Moreover, the deadline for regulatory compliance has been delayed repeatedly in recent years, in large part because of carrier opposition or non-compliance.

[12]  Carriers do not typically generate and retain more precise location records in the normal course.  The exceptions to this general rule are so-called "kiddie tracker" phones, where – for a separate fee – some carriers offer a service for parents to monitor the movement of a child's phone.  *See, e.g.,* http://www.alltel.com/familyfinder .  These services are not included in standard feature packages, and are often restricted to certain handsets.  *See, e.g., id.*

tower at a particular location north of Boston.  Here, this means that the target phone was likely, but

not necessarily, roughly northeast of the specified tower coordinates. It does not give the coordinates

of the target phone itself, nor even an approximate indication of its distance from the tower; instead

it only suggests an area tens of thousands (or more) square yards large in which the target phone was

used.  As noted above by the FCC, the fact that wireless calls are not always handled by the nearest

cell further contributes to the generality and imprecision of this information.

Thus, cellular phone companies' historical records of cell-site usage are much too imprecise

to tell whether calls have been made or received from a constitutionally protected space, let alone

to reveal facts about the interiors of private homes or other protected spaces.  *See* 405 F. Supp. 2d

at 449 (cell-site information "does not provide a 'virtual map' of the user's location....  The

information does not pinpoint a user's location within a building.").

As a final basis to support the notion  that customers enjoy Fourth Amendment rights in the

routine business records of their wireless providers, the Opinion and Order cites a range of statutes

purportedly conferring constitutional rights.  For instance, the decision below invokes the Wireless

Communication and Public Safety Act of 1999 (WCPSA), 47 U.S.C. § 222(f), asserting that it

"expressly recognizes the importance of an individual's expectation of privacy in her physical

location." 534 F. Supp. 2d at 610.

In fact, however, the WCPSA offers no such recognition.  Instead, the WCPSA simply states

that "[e]xcept as required by law or with the approval of the customer, a telecommunications carrier

that receives or obtains customer proprietary network information by virtue of its provision of a

telecommunications service shall only use, disclose, or permit access to individually identifiable

customer proprietary network information" in certain specified situations. 47 U.S.C. § 222(c)(1)

(emphasis added).  The phrase "except as required by law" encompasses appropriate criminal legal process.  *See Parastino v. Conestoga Tel & Tel. Co.*, No. Civ. A 99-679, 1999 WL 636664, at *1-2 (E.D.Pa, Aug. 18, 1999) (holding that a valid subpoena falls within the "except as required by law" exception of § 222(c)(1)).  Thus, the WCSPA does not create or reinforce any constitutional expectation of privacy, and therefore imposes no bar to the disclosure of cell-site information pursuant to 2703(d) orders.

More importantly, a federal statute cannot in any event establish a constitutional norm.  As the Fifth Circuit has observed in analyzing the Right to Financial Privacy Act,

> [w]hile it is evident that Congress has expanded individuals' right to privacy in bank records of their accounts, appellees are mistaken in their contention that the expansion is of constitutional dimensions.  <u>The rights created by Congress are statutory, not constitutional</u>.

*United States v. Kington*, 801 F.2d 733, 737 (5th Cir. 1986) (emphasis supplied).

Thus, because there is no reasonable expectation of privacy in historical cell-site records, the Fourth Amendment does not limit compelled disclosure of such records pursuant to a 2703(d) order.

## V.  CONCLUSION

For these reasons, the government respectfully submits that this Court should reverse the

Opinion and Order below and grant the Application in the instant case.

Respectfully submitted
MARY BETH BUCHANAN
United States Attorney


s/ Soo C. Song
SOO C. SONG
Assistant U.S. Attorney
U.S. Post Office and Courthouse
700 Grant Street
Suite 4000
Pittsburgh, Pennsylvania 15219
(412) 644-3500 (Phone)
(412) 644-2645 (Fax)
soo.song@usdoj.gov
DC ID No. 457268

PAUL E. HULL
Assistant U.S. Attorney
U.S. Post Office and Courthouse
700 Grant Street
Suite 4000
Pittsburgh, Pennsylvania 15219
(412) 644-3500 (Phone)
(412) 894-7311 (Fax)
paul.hull@usdoj.gov
PA ID No. 35302

MARK ECKENWILER
Associate Director
Office of Enforcement Operations
Criminal Division
U.S. Department of Justice
John Keeney Building
10th Street and Constitution Avenue NW
Washington, DC 20530

NATHAN JUDISH
Senior Counsel
Computer Crime and Intellectual Property
Section
Criminal Division
U.S. Department of Justice
John Keeney Building
10th Street and Constitution Avenue NW
Washington, DC 20530